No. 2023-1363

_____

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

EDGAR ABLAN, ET AL.,
*Plaintiffs*

CHRISTINA BANKER, TODD BANKER,
*Plaintiffs-Appellees*

v.

UNITED STATES,
*Defendant-Appellant*

_____

Appeal from the United States Court of Federal Claims in No. 1:17-cv-01409-CFL, 1:17-cv-09001-CFL, Senior Judge Charles F. Lettow.

_____

**PETITION FOR REHEARING EN BANC**

_____

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
Environment and Natural Resources Division
BRIAN C. TOTH
*Attorney*
Appellate Section
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3112
brian.toth@usdoj.gov

(case caption continued on inside cover)

No. 2023-1365

———————————————

SANDRA ABDOU, ET AL.,
*Plaintiffs*

ELIZABETH BURNHAM,
*Plaintiff-Appellee*

v.

UNITED STATES,
*Defendant-Appellant*

———————————————

Appeal from the United States Court of Federal Claims in No. 1:17-cv-01786-CFL, 1:17-cv-09001-CFL, Senior Judge Charles F. Lettow.

———————————————

Nos. 2023-1366, 2023-1412

———————————————

CHRISTINA MICU, AND ALL OTHERS SIMILARLY SITUATED, SCOTT HOLLAND, CATHERINE POPOVICI, KULWANT SIDHU,
*Plaintiffs-Cross-Appellants*

ELISIO SOARES, SANDRA GARZA RODRIGUEZ, ERICH SCHROEDER, MARINA AGEYEVA, GLENN PETERS, VIRGINIA HOLCOMB,
*Plaintiffs*

v.

UNITED STATES,
*Defendant-Appellant*

———————————————

Appeals from the United States Court of Federal Claims in No. 1:17-cv-01277-CFL, 1:17-cv-09001-CFL, Senior Judge Charles F. Lettow.

———————————————

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

STATEMENT OF COUNSEL ............................................................................ iv

INTRODUCTION...............................................................................................1

ISSUES PRESENTED.........................................................................................2

STATEMENT .....................................................................................................2

ARGUMENT .....................................................................................................6

The panel makes the Fifth Amendment a guarantee of damages
from aberrant natural disasters if the government does not provide
perfect flood control.........................................................................................6

I.     The panel erred in holding that the United States
appropriated an interest in Plaintiffs' properties by flooding
during a natural disaster that occurred once in the life of a
flood-control project. ..............................................................................7

II.    The Corps is excused from liability under the necessity
doctrine...................................................................................................13

CONCLUSION ................................................................................................17

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Arkansas Game and Fish Commission v. United States*,
568 U.S. 23 (2012) ...............................................................4, 6, 9, 11

*Armstrong v. United States*,
364 U.S. 40 (1960) ................................................................... 16

*B Amusement Co. v. United States*,
180 F. Supp. 386 (Ct. Cl. 1960) .................................................. 13

*Bowditch v. City of Boston*,
101 U.S. 16 (1879) ................................................................... 13

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ..............................................................6, 9, 12

*Currie v. Silvernale*,
171 N.W. 782 (Minn. 1919) ....................................................... 14

*Eyherabide v. United States*,
345 F.2d 565 (Ct. Cl. 1965) ....................................................... 13

*Ideker Farms, Inc. v. United States*,
71 F.4th 964 (Fed. Cir. 2023) ..................................................5, 7, 12

*In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*,
146 Fed. Cl. 219 (2019) ..................................................3, 4, 5, 10, 15, 16

*In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*,
162 Fed. Cl. 495 (2022) ..............................................................4, 10

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ................................................................. 14

*Milton v. United States*,
36 F.4th 1154 (Fed. Cir. 2022) ....................................................4, 15

*National Board of YMCA v. United States*,
395 U.S. 85 (1969) ...................................................................14, 15

*National By-Products, Inc. v. United States*,
405 F.2d 1256 (Ct. Cl. 1969) .......................................................7, 12

*North Counties Hydro-Electric Co. v. United States*,
70 F. Supp. 900 (Ct. Cl. 1947) ...................................................... 13

*North Counties Hydro-Electric Co. v. United States*,
151 F. Supp. 322 (Ct. Cl. 1957) .................................................... 13

*Portsmouth Harbor Land & Hotel Co. v. United States*,
260 U.S. 327 (1922) .................................................................8, 9, 12

*Respublica* v. *Sparhawk*,
1 Dall. 357 (Penn. 1788)............................................................... 13

*Stockton v. United States*,
214 Ct. Cl. 506 (1977) ...................................................................4, 11

*TrinCo. Inv. Co. v. United States*,
722 F.3d 1375 (Fed. Cir. 2013)...................................................... 14

*United States v. Caltex*,
344 U.S. 149 (1952) ...................................................................... 13

*United States v. Cress*,
243 U.S. 316 (1917) ........................................................................ 9

# STATEMENT OF COUNSEL

Based on my professional judgment, I believe rehearing en banc is required to answer a precedent-setting question of exceptional importance: Whether a single flooding of private property from the operation of a flood-control project during an unprecedented, record-breaking storm that is not expected to recur during the useful life of the project constitutes the appropriation of an easement by the United States. *See* Fed. Cir. R. 35(b)(2).

/s/ *Brian C. Toth*
Counsel for the United States

## INTRODUCTION

The panel held the United States liable to pay compensation under the Fifth Amendment for property damage caused by flooding upstream of a flood-control project near Houston, Texas, after record-setting rainfall from Hurricane Harvey overwhelmed the project, prompting the U.S. Army Corps of Engineers ("Corps") to activate emergency procedures for the first and only time in the project's 70-year history. If the panel's decision stands, it likely will result in billions of dollars in liability for related claims. The panel erred in two respects.

First, the singular, unprecedented nature of the flooding from Hurricane Harvey did not amount to a taking of Plaintiffs' property, whether analyzed categorically or ad hoc. That is so because the flooding was a one-time incursion more in the nature of a trespass than a taking, and it was never expected to occur more than once in the project's lifetime. The panel's decision misapplies recent Supreme Court rulings and fails to correctly address flooding from extraordinary storms under the tests for both permanent and temporary takings.

Second, the Corps is excused from liability here under the necessity doctrine. Hurricane Harvey was the first and only time the Corps operated the dam's floodgates under its emergency procedures. Even though the reservoirs were empty when the storm began, they rapidly filled to record levels, and water began flowing uncontrolled around the end of one of the dams. In that situation,

1

the Corps operated the project to ensure the dams' integrity and avoid the even greater calamity of dam failure upstream from one of the Nation's largest cities. Under those circumstances, liability is excused by the necessity doctrine. If existing circuit law forecloses that conclusion, it should be revisited.

## ISSUES PRESENTED

Whether a single flooding of private property from the operation of a flood-control project during an unprecedented, record-breaking storm that is not expected to recur during the useful life of the project constitutes the appropriation of an easement by the United States.

## STATEMENT

1.　　The Buffalo Bayou and Tributaries Project comprises two lengthy earthen dams and reservoirs that are normally dry, except during heavy rainfall when they detain water temporarily to manage and reduce flooding downstream in Houston. When the Corps built the structures in the 1940s, it acquired enough land for upstream reservoirs to capture flood waters based on the worst storm to have flooded the Project area's watersheds. But the Corps designed the dam's earthen embankments with a margin of safety to withstand larger storms that had occurred elsewhere in the region. At the time, the Corps believed that such larger storms were likely to occur (if at all) no more than once in the Project's

life. The Corps later worked with developers and surrounding counties to warn the public of these risks.

In August 2017, approximately 70 years after the Project's completion, Hurricane Harvey made landfall in Texas, stalling over Houston and delivering historic amounts of rainfall, including about 31 inches over four days in the Project watersheds. Op. 6; *see In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 240 (2019) ("*Upstream Reservoirs*") (describing Harvey as "the largest storm in the recorded history of the United States"). The record-breaking rain overwhelmed the Project. The Corps operated the dams' floodgates under procedures that called for releasing water that contributed to downstream flooding. The Corps' operation of the dams also caused them to retain record-high pools in the upstream reservoirs, causing significant flooding on Plaintiffs' properties for the first and only time in the Project's history.

2. Hundreds of property owners, both upstream and downstream, filed claims that the Corps' operation of the Project during Hurricane Harvey was a taking of their property for which they are owed compensation under the Fifth Amendment. The Court of Federal Claims ("CFC") organized the litigation into two different groups based on whether the properties were located upstream or downstream of the dams. Judge Smith initially dismissed the downstream cases due to the plaintiffs' failure to identify a property right to perfect flood control

3

in the face of an Act of God, but this Court reversed and remanded. *See Milton v. United States*, 36 F.4th 1154 (Fed. Cir. 2022). In the upstream cases, overseen by Judge Lettow, the parties went to trial on liability using 13 bellwether properties. The CFC applied the multifactor test from *Arkansas Game and Fish Commission v. United States*, 568 U.S. 23 (2012), to hold the United States liable for a permanent taking of a flowage easement. *Upstream Reservoirs*, 146 Fed. Cl. at 249-63. After a second trial on compensation narrowed to six bellwether properties, the CFC awarded compensation for an "atypical" flowage easement that would be used "only in the event of a natural disaster." *In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*, 162 Fed. Cl. 495, 523 (2022).

3. A panel of this Court affirmed the upstream liability ruling. Op. 8-18. It held that the flooding gave rise to a permanent taking and that the CFC did not err in ruling that the flooding was "permanently recurring." Op. 11 (footnote omitted). The panel relied on a 1977 Court of Claims decision stating that "only one actual flooding is enough" to determine liability "when the property is upstream of the dam and below the contour line to which the dam is designed to impound water." Op. 12-13 (quoting *Stockton v. United States*, 214 Ct. Cl. 506, 518-19 (1977)). Whether flooding is "inevitably recurring" to give rise to a permanent taking "turns not on mere frequency," the panel held, but on whether the government action will "foreseeably produce intermittent

4

invasions by flooding without identifiable end into the future." Op. 13 (quoting *Ideker Farms, Inc. v. United States*, 71 F.4th 964, 979 (Fed. Cir. 2023)). Although the parties presented widely differing evidence on the likely time until a storm would return resulting in flooding like that experienced from Harvey, the panel nonetheless held that the CFC did not "clearly err in holding that the [upstream] flooding … was objectively foreseeable and would inevitably recur." Op. 14.

Alternatively, the panel held that the flooding would still be a taking under *Arkansas Game*'s multifactor test, even if it were temporary. Op. 14-15. With respect to the flooding's "time and duration," the panel observed that the Corps "reserve[d] the right to repeat the impoundment," and it affirmed the CFC's finding that "the likelihood of recurrent flooding is high," notwithstanding the lack of any specific finding on the frequency of recurrence. Op. 15 (quoting *Upstream Reservoirs*, 146 Fed. Cl. at 251 & n.20). The panel thus affirmed the CFC's ruling that the government "obtained a 'permanent right to inundate the property with impounded flood waters.'" *Id*. (quoting *Upstream Reservoirs*, 146 Fed. Cl. at 250). The panel further deemed the flooding "foreseeable" and "intentional" and held that Plaintiffs had "reasonable investment-backed expectations," notwithstanding government maps indicating that their property could be flooded in an intense storm. Op. 16-17. These factors meant that the Corps had taken the property (as opposed to temporarily trespassed). Op. 17.

Finally, the panel rejected the United States' necessity defense because Hurricane Harvey was not an "unforeseeable exigency," because the Project was not built to protect upstream properties, and because the government's action here was a typical case of harming some persons (upstream owners) for the benefit of others (downstream owners), for which just compensation should be borne by the public as a whole. Op. 17-18.

## ARGUMENT

**The panel makes the Fifth Amendment a guarantee of damages from aberrant natural disasters if the government does not provide perfect flood control.**

A panel of the Court endorsed the CFC's expansive approach to taking-by-flooding compensation despite that the Supreme Court has warned that its "modest decision" in *Arkansas Game*, setting forth an ad hoc, multifactor test for takings-by-flooding, "augurs no deluge of takings liability." 568 U.S. at 37. Nor does it matter, apparently, that while the present case was pending in the CFC, the Supreme Court said that "[i]solated physical invasions" without a grant of access are still "properly assessed as individual torts rather than appropriations of a property right." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 159 (2021). Even this Court in *Ideker Farms*, while minimizing the importance of *Arkansas Game*'s ad hoc test and elevating the categorical approach to liability in *Cedar Point*, agreed that "up to three flooding events 'by themselves' do not qualify as (even

a temporary) taking." 71 F.4th at 980 (quoting *National By-Products, Inc. v. United States*, 405 F.2d 1256, 1273 (Ct. Cl. 1969)).

But now, no more. The panel here concluded that "whether flooding is inevitably recurring turns not on mere frequency." Op. 13. If even a *single* upstream flood occurs "below the contour line to which [a] dam is designed to impound water," then a categorical taking results. *Id*. (quotation marks, citation omitted). That conclusion misreads past Court of Claims precedent (*Stockton*), fails to reckon with recent Supreme Court precedent (*Arkansas Game* and *Cedar Point*), and now extends this Court's error in *Ideker Farms* to guarantee compensation of landowners affected by the government's best, albeit imperfect, efforts to manage flooding risks. The full Court should grant rehearing to address these exceptionally important issues.

## I. The panel erred in holding that the United States appropriated an interest in Plaintiffs' properties by flooding during a natural disaster that occurred once in the life of a flood-control project.

The panel's liability ruling rests on its conclusion that the government appropriated an easement on Plaintiffs' property. In so concluding, the panel relied "not on mere frequency" of the flooding, but on whether the government action "will foreseeably produce intermittent invasions by flooding without identifiable end into the future." Op. 13 (quoting *Ideker Farms*, 71 F.4th at 979).

But essentially eliminating consideration of flooding's frequency, as the panel did, contradicts established precedent.

The role of a property-incursion's frequency in distinguishing between trespass and takings has long been recognized and was recently reiterated by the Supreme Court in both *Arkansas Game* and *Cedar Point*. Those decisions cited and quoted *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327 (1922). There, the Court found a taking where the government had set-up coastal guns with the intent to fire over private property, the government could not fire the guns other than over the plaintiff's property, and the government had fired guns over the property many times over the years. *Id.* at 328, 330. The Court explained: "[t]he repetition of [the firing] *through many years* and the establishment of the fire control may be found to show an abiding purpose to fire when the United States sees fit." *Id.* at 330 (emphasis added). "[W]hile a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove [the intent to take property]." *Id*. at 329-30. Twice before, the courts had rejected the plaintiff's takings claims even though the guns had fired over the plaintiff's property several times and there was an "apprehension that the firing would be repeated." *Id.* at 328. It was not until there was a sufficient "repetition of those acts [i.e., the firing] through many

years and the establishment of the fire control" that the Court found the complaint stated a claim. *See id.* at 330.

In the flooding context, for many decades the leading precedent focused on whether "permanent liability" for a taking had resulted from "intermittent but inevitably recurring overflows." *United States v. Cress*, 243 U.S. 316, 328 (1917). *Cress* concerned land "subject to frequent overflows of water from the river." *Id*. at 327 (quoting district court findings); *accord Arkansas Game*, 568 U.S. at 32 (describing the flooding in *Cress* as "seasonally recurring"). The Court later recognized takings liability for repeated but time-limited flooding in *Arkansas Game*, adopting a multifactor test for temporary takings-by-flooding and recognizing "[s]everity of the interference" as a consideration, citing and quoting *Portsmouth Harbor* to indicate how frequency is connected. 568 U.S. at 39 (citing 260 U.S. at 329-30). More recently, *Cedar Point* reiterated the longstanding distinction between trespass and takings, emphasizing that "[i]solated physical invasions . . . are properly assessed as individual torts," and noting that *Arkansas Game* is "an application of the traditional trespass-versus-takings distinction" to temporary flooding. 594 U.S. at 159-60.

The panel was wrong to eliminate the singular rarity of Hurricane Harvey's flooding as a factor in determining whether there was a taking. It said the CFC "made factual findings" that the flooding of Plaintiffs' properties

9

"would inevitably recur without identifiable end," which the panel upheld as "not clearly erroneous." Op. 13. But the panel's premise is incorrect: the CFC did not make any specific factual findings on how often a similarly sized flood would recur, despite the United States' evidence that similar flooding would not happen again for 700 to 900 years. Indeed, the CFC seemed to recognize the extraordinary rarity of the recurrence in its valuation decision, which characterized the easement it held the government acquired was "atypical" and would be used "only in the event of a natural disaster." 162 Fed. Cl. at 523.[1]

That the Corps designed the dams to withstand a hypothetical storm that it considered the worst-case scenario does not mean that liability necessarily follows. Dam failure would be catastrophic, abruptly putting densely populated areas at risk, and significant safety concerns justified engineering the Project to withstand even storms the Corps deemed unlikely to occur. In contrast, the Corps acquired property interests three feet above the estimated pool of the worst *observed* storm to have hit the Project's watersheds. That difference in approaches to dam engineering and property acquisition does not determine liability. The

---

[1] Even if the CFC's statements about inevitability were a finding of fact (which they are not), that would not determine liability where the CFC acknowledged the Corps' report that similar flooding cannot be expected to occur "more than once in the lives of these structures." *Upstream Reservoirs*, 146 Fed. Cl. at 232. The latter fact, not the former, conclusively establishes that the flooding here was merely a trespass.

surrounding upstream areas were not heavily developed when the Project was designed, and the Corps had to balance safety risks with project costs. Acquiring property interests based on the largest historically observed storm was prudent, considering the feasibility of undertaking a flood-control program that Congress had directed nationwide. Just because the dams were designed to temporarily detain floodwater during a hypothetical storm with no historic precedent does not mean the Corps intended to, or in fact did, appropriate a property interest.

The panel's conclusion to the contrary relies (Op. 13) on a misreading of dictum from *Stockton* that only one flood may establish a taking if it occurs on land "below the contour line to which the dam is designed to impound water." 214 Ct. Cl. at 518-19. In *Stockton* it took only about nine years after the dam's construction for the pool behind the dam to reach the record water-level, which was then "approximated" twice more over the next year-and-a-half. *Id.* at 519. The government agreed that the same pool-level would be reached again about every eight years. *Id*. In other words, *Stockton* didn't involve only one flood, much less a singular and unprecedented flood. If it could be read that way (and it cannot, at least not reasonably), the dictum is contravened by *Arkansas Game* and *Cedar Point*. Both of those cases—the former with an ad hoc analysis, the latter with a categorical rule—emphasize that "a single act [of trespass] may not be enough" to constitute a taking. *Arkansas Game*, 568 U.S. at 39 (quoting

11

*Portsmouth Harbor*, 260 U.S. at 329-30); *accord Cedar Point*, 594 U.S. at 159. The panel's ruling that the single flood here *is* enough to conclude that a property right has been appropriated, perhaps because a similar storm might return, eviscerates the traditional "trespass-versus-takings distinction" preserved by those precedents. *Id.* at 160.

The panel's reliance on *Ideker Farms* is misplaced. *Ideker* concerned flooding downstream of a system of dams and reservoirs on the Missouri River. The Corps changed that system's operations and modified the river's structure, which "caused frequent and severe flooding" on the plaintiffs' farms over a seven-year period, 71 F.4th at 973, leading the Court to hold the government liable for those "permanent recurring floodings" as "*per se* takings," *id.* at 986. Indeed, "both parties agree[d] that if the court finds that a taking occurred, that taking is permanent." *Id.* at 979 (quotation marks, citation omitted).

By contrast, the United States here never agreed that any taking would be permanent. And the one-time flooding in this case occurred during an extraordinary storm that was expected only once in the Project's lifetime. But the panel's ruling that a taking occurred is at is at odds with *Ideker*, which echoed several Court of Claims decisions that "up to three flooding events 'by themselves' do not qualify as (even a temporary) taking." *Id.* at 980 (quoting *National By-Products, Inc.*, 405 F.2d at 1273). The panel's decision contravenes

pertinent precedent and holds the United States liable to pay compensation for what was, at most, a trespass.[2]

## II. The Corps is excused from liability under the necessity doctrine.

The panel was also wrong to reject the Corps' reliance on the necessity defense. That defense has a long history "[a]t the common law," where "every one had the right to destroy real and personal property, in cases of actual necessity, to prevent the spreading of a fire, and there was no responsibility on the part of such destroyer, and no remedy for the owner …. There are many other cases besides that of fire,—some of them involving the destruction of life itself,—where the same rule is applied." *Bowditch v. City of Boston*, 101 U.S. 16, 18 (1879) (citing *Respublica* v. *Sparhawk*, 1 Dall. 357, 362 (Penn. 1788)); *accord United States v. Caltex*, 344 U.S. 149, 154 (1952) ("[C]ommon law ha[s] long recognized that in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved."

---

[2] *See also Eyherabide v. United States*, 345 F.2d 565, 569 (Ct. Cl. 1965) ("Isolated invasions, such as one or two floodings …, do not make a taking." (citations omitted)); *B Amusement Co. v. United States*, 180 F. Supp. 386, 389 (Ct. Cl. 1960) (holding that one flood is not a taking); *North Counties Hydro-Electric Co. v. United States*, 70 F. Supp. 900, 903 (Ct. Cl. 1947) (same); *North Counties Hydro-Electric Co. v. United States*, 151 F. Supp. 322, 323 (Ct. Cl. 1957) ("Two floodings … do not constitute a taking.").

(footnote omitted)). Necessity doctrine can determine whether floodwaters must be stored on one's property rather than diverted to cause damages elsewhere. *See*, *e.g.*, *Currie v. Silvernale*, 171 N.W. 782, 784 (Minn. 1919) (holding that while repeated entry onto a plaintiff's land to preserve the water flow to the defendant's mill-dam was trespass, the first entry "may" have been justified to save defendant's water flow and avert erosion on plaintiff's land).

The panel wrongly rejected the necessity defense on the ground that "the government did not build and operate the [Project] for the benefit of Plaintiffs." Op. 17. That misapprehends the doctrine, which absolves the government of "liability for the destruction of 'real and personal property, in cases of actual necessity, to prevent' … or forestall … grave threats to the lives and property of others." *TrinCo. Inv. Co. v. United States*, 722 F.3d 1375, 1377 (Fed. Cir. 2013) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029 n.16 (1992)). It allows the government, "with immunity, [to] destroy the property of a few that the property of the many and the lives of many more could be saved." *Id.* (internal quotations omitted).

The doctrine does not mandate that a plaintiff benefit from the property's destruction. Although the panel cited *National Board of YMCA v. United States*, 395 U.S. 85 (1969) for that proposition, *YMCA* does not support it. *YMCA* held that a "temporary, unplanned occupation of petitioners' buildings" by the

military was not a taking because the private petitioners were "the particular intended beneficiary of the governmental activity." *Id.* at 92-93. But *YMCA* does not mention the necessity defense, and the fire cases show that the defense is not so limited. There, some property is utterly destroyed so that fire does not spread to other parts of the community. The beneficiary is the community as a whole, not the owners of destroyed buildings, and the government is protecting the common good in the face of a veritable disaster, as occurred here. Indeed, both the federal and state governments declared Harvey a natural disaster across the affected region. That the Corps had a plan to prevent further destruction downstream does not change that it was an extraordinary event, fitting for the doctrine's application.

Nor did the Project's operation during Hurricane Harvey require upstream property owners alone to bear the burden of flooding that "aided some property owners (downstream residents) and harmed others (upstream residents)." Op. 18. Although the Project was operated according to protocol (and recall that the reservoirs were empty when the Hurricane began), the amount of rainfall and inflow to the reservoirs from Harvey overwhelmed the Project. For example, uncontrolled releases occurred along a spillway at one of the dams. *Upstream Reservoirs,* 146 Fed. Cl. at 241. And plenty of flooding and property damage occurred downstream as well. *See Milton v. United States*, 36

15

F.4th 1154 (Fed. Cir. 2022) (remanding order dismissing takings claims by hundreds of downstream property owners). The water had to flow somewhere, and the Corps' operation of the Project saved billions of dollars in losses on the whole. *See Upstream Reservoirs*, 146 Fed. Cl. at 241. It cannot be said that this situation was "forcing some people *alone* to bear public burdens" that should be borne by the public as a whole. Op. 18 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

The necessity defense also does not fail here merely because the Corps' response to the situation reflects planning for a rare, one-time emergency rather than an "unforeseeable exigency." Op. 17. That purported requirement is not supported by precedent—it is not mentioned by *Lucas*, *Bowditch*, or *TrinCo*. Had the Corps built dams (or somehow raised their height) *during* the storm, the resultant flooding presumably would be excused by the defense. That the Corps had the foresight to design and construct the dams in advance to withstand similar once-in-the-life-of-the-project flooding should not be a disqualifying factor. Nor should Fifth Amendment doctrine discourage advanced planning for natural disasters.

## CONCLUSION

The petition should be granted.

Respectfully submitted,

/s/ *Brian C. Toth*

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

BRIAN C. TOTH
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice

March 2026
90-1-23-15153

**Certificate of Compliance With Type-Volume Limit,**

**Typeface Requirements, and Type-Style Requirements**

1.  This document complies with the word limit of Fed. R. App. P. 35(b)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2):

☒   this document contains  3,787  words, or
☐   this brief uses a monospaced typeface and contains ____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

☒   this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Calisto MT font, or

☐   this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

 /s/ Brian C. Toth

Attorney for  Defendant-Appellant the United States

Dated:  March 9, 2026

# ADDENDUM

# United States Court of Appeals
# for the Federal Circuit

---

**EDGAR ABLAN, ET AL.,**
*Plaintiffs*

**CHRISTINA BANKER, TODD BANKER**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2023-1363

---

Appeal from the United States Court of Federal Claims in Nos. 1:17-cv-01409-CFL, 1:17-cv-09001-CFL, Senior Judge Charles F. Lettow.

------------------------------------------------

**SANDRA ABDOU, ET AL.,**
*Plaintiffs*

**ELIZABETH BURNHAM**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2023-1365

_____

Appeal from the United States Court of Federal Claims in Nos. 1:17-cv-01789-CFL, 1:17-cv-09001-CFL, Senior Judge Charles F. Lettow.

-------------------------------------------------

**CHRISTINA MICU, AND ALL OTHERS SIMILARLY SITUATED, SCOTT HOLLAND, CATHERINE POPOVICI, KULWANT SIDHU,**
*Plaintiffs-Cross-Appellants*

**ELISIO SOARES, SANDRA GARZA RODRIGUEZ, ERICH SCHROEDER, MARINA AGEYEVA, GLENN PETERS, VIRGINIA HOLCOMB,**
*Plaintiffs*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

_____

2023-1366, 2023-1412

_____

Appeals from the United States Court of Federal Claims in Nos. 1:17-cv-01277-CFL, 1:17-cv-09001-CFL, Senior Judge Charles F. Lettow.

_____

Decided:  December 22, 2025

_____

ROGER J. MARZULLA, Marzulla Law, LLC, Washington, DC, argued for all plaintiffs-appellees. Also represented by NANCIE GAIL MARZULLA. Plaintiffs-appellees Christina Banker, Todd Banker also represented by VUK VUJASINOVIC, VB Attorneys, PLLC, Houston, TX. Plaintiff-appellee Elizabeth Burnham also represented by EDWIN ARMISTEAD EASTERBY, I, The Easterby Law Firm, P.C., Houston, TX.

IAN HEATH GERSHENGORN, Jenner & Block LLP, Washington, DC, argued for plaintiffs-cross-appellants. Also represented by ELIZABETH B. DEUTSCH; DANIEL H. CHAREST, Burns Charest LLP, Dallas, TX; CHARLES IRVINE, Irvine & Conner PLLC, Houston, TX; EMERY LAWRENCE VINCENT, Sorrels Law, Dallas, TX.

BRIAN C. TOTH, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by TODD KIM.

_____

Before REYNA, TARANTO, and CUNNINGHAM, *Circuit Judges.*

CUNNINGHAM, *Circuit Judge.*

Appellees[1] and Cross-Appellants[2] (collectively, "Plaintiffs") owned property interests upstream of the Addicks and Barker Dams in Houston, Texas. The Army Corps of Engineers ("the Corps") designed and operated these dams with the goal of preventing flooding in downtown Houston during storms. Plaintiffs allege that the protocol adopted

_____

[1] Christina Banker, Todd Banker, and Elizabeth Burnham.
[2] Christina Micu, Scott Holland, Catherine Popovici, and Kulwant Sidhu.

by the Corps included using all available reservoir storage to protect downtown Houston, even at the cost of flooding private lands. When Hurricane Harvey struck in 2017, Plaintiffs' properties flooded, and they subsequently sued the government in the United States Court of Federal Claims.

The Court of Federal Claims found the government liable for taking permanent natural-disaster flowage easements across Plaintiffs' properties. *See In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 264 (2019) ("*Liability Decision*"). After the liability trial, Plaintiffs moved to certify a class for liability purposes. The Court of Federal Claims denied class certification based on the untimeliness of Plaintiffs' motion and the criteria for certification. *See In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 157 Fed. Cl. 189, 193 (2021) ("*Class Certification Decision*"). The Court of Federal Claims then selected six bellwether properties for a damages trial, where it awarded a total of $454,535.03, plus interest from the date of taking. *In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 162 Fed. Cl. 495, 534 (2022) ("*Damages Decision*").

The government appeals the *Liability Decision*, arguing that its operation of the dams was not a taking. Cross-Appellants appeal the *Class Certification Decision*, contending that their motion was timely. Both the government and Cross-Appellants appeal the *Damages Decision*; the government contends that the Court of Federal Claims erroneously awarded "consequential damages" for leasehold advantage, lost rent, displacement, and damaged personal property. Meanwhile, Cross-Appellants contend that the Court of Federal Claims erred by offsetting generally available Federal Emergency Management Agency ("FEMA") relief and by awarding Ms. Popovici $0 for a permanent flowage easement on her property. We affirm the decisions of the Court of Federal Claims as to liability and class certification. With respect

to damages, we affirm the decision as to leasehold advantage, damaged personal property, and offsetting of FEMA relief, but vacate the decision as to lost rent, displacement, and the valuation of Ms. Popovici's easement.

## I.   BACKGROUND

### A.

Houston sits at the confluence of Buffalo Bayou and White Oak Bayou, at the base of a system of streams that flow through a flat plain. *Liability Decision* at 228–29; J.A. 8395–96 ¶¶ 5–9. The area features soil that does not drain well, and the streams are subject to flooding during frequent storms. *Liability Decision* at 229; J.A. 8396 ¶¶ 7–8. Major storms in 1929 and 1935 resulted in extensive property damage and loss of life. *Liability Decision* at 229; J.A. 8254; J.A. 8397–98 ¶¶ 10–11; J.A. 8786. In the aftermath of the storms, Congress authorized the Corps to reduce downstream flood risk by designing and building the Addicks and Barker Dams as part of the Buffalo Bayou and Tributaries, Texas Project. *Liability Decision* at 230; An Act Authorizing the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes, Pub. L. No. 75-685, 52 Stat. 802, 804 (1938); *see also* J.A. 8450; J.A. 8790; J.A. 9884–85 ¶ 4. The Corps completed the dams in 1948. *Liability Decision* at 231; J.A. 8454–55. The reservoirs of the Addicks and Barker Dams are typically dry but fill with water when it rains to prevent or reduce downstream flooding. *Liability Decision* at 239; J.A. 8476–89.

During the planning of the Addicks and Barker Dams, the Corps considered buying all upstream land within the dams' reservoirs that would be inundated in the event of "the design storm rainfall of 31.4 inches." *Liability Decision* at 232 (quoting J.A. 9907 ¶ 54). However, the Corps "considered it 'unnecessary to acquire lands to the pool elevation which would be produced by the design storm.'" *Id.*

(quoting J.A. 9907 ¶ 54). Instead, the Corps recommended purchasing only part of that land, namely, the part that would be inundated even in smaller storms, contending that "the savings in annual interest would be in excess of the probable damages" from the design storm or other larger storms. J.A. 9907–08 ¶ 54; *Liability Decision* at 231–33. Accordingly, the government purchased only some of the lower-lying land within the reservoirs of the Addicks and Barker Dams. *Liability Decision* at 231–33; J.A. 1044–45 ¶¶ 94, 99, 102, 104. The Corps recognized that this decision "w[ould] eventually place the [g]overnment in the position of having to flood the area within the reservoir with the accompanying damages in order to protect downstream improvements in the event of a severe future storm." *Liability Decision* at 234 (quoting J.A. 8864).

On August 25, 2017, Hurricane Harvey made landfall along the coast of Texas as a Category 4 hurricane. *Liability Decision* at 240; J.A. 1045 ¶ 107. Hurricane Harvey stalled over the Houston area as a tropical storm for four days. *Liability Decision* at 240; J.A. 1045 ¶ 108. The storm involved historic amounts of rainfall, with an average four-day rainfall of approximately 31 inches in the Addicks and Barker watersheds. J.A. 9740; J.A. 9746; *see Liability Decision* at 240. As a result, the flood pools reached records of 101.6 feet in the Barker Dam reservoir and 109.1 feet in the Addicks Dam reservoir. *Liability Decision* at 241; J.A. 1045–46 ¶¶ 110–15. The reservoir water thus could not be contained on government-owned land and flooded onto privately-owned land within the reservoirs, causing extensive damage. *Liability Decision* at 241; J.A. 8017; J.A. 8023.

## B.

Numerous property owners filed complaints in the Court of Federal Claims, alleging that the operation of the Barker and Addicks Dams and the subsequent flooding constituted an uncompensated physical taking of their

property. *Liability Decision* at 228. The Chief Judge of the Court of Federal Claims consolidated the cases into a Master Docket, then split them into an Upstream Sub-Master Docket and a Downstream Sub-Master Docket. *Liability Decision* at 228; *see Milton v. United States*, 36 F.4th 1154, 1159 (Fed. Cir. 2022).

The Court of Federal Claims bifurcated the liability and damages issues and selected, for a liability trial, thirteen bellwether properties as representative of the upstream properties at issue in cases belonging to the Upstream Sub-Master Docket. *Liability Decision* at 227–28. After a ten-day trial, the Court of Federal Claims found the government liable for a Fifth Amendment taking of a flowage easement on all thirteen properties. *Id.* at 228. The Court of Federal Claims held that Plaintiffs possessed cognizable property interests, *id.* at 248–49, that the government took flowage easements on those properties, *id.* at 249–63, and that the government's asserted defenses of police power and necessity did not absolve it of liability. *Id.* at 263–64.

After the liability phase concluded, Plaintiffs moved to certify a class for liability purposes. The Court of Federal Claims denied the motion, holding that "a trial on the merits of liability is a line after which moving for class certification is presumptively inappropriate." *Class Certification Decision* at 196. The Court of Federal Claims further held that the "timing of plaintiffs' class certification motion" would "undermine the adequacy of representation and superiority of class certification" under Court of Federal Claims Rule ("RCFC") 23. *Id.* at 197.

The Court of Federal Claims selected six of the thirteen bellwether upstream properties for a compensation trial. *Damages Decision* at 502. Ultimately, the Court of Federal Claims awarded Plaintiffs amounts between $1,401.49 and $195,549.86, for a total of $454,535.03, plus interest. *Id.* at 534. The Court of Federal Claims awarded all Plaintiffs,

except Ms. Popovici, compensation for the taking of a permanent flowage easement as measured by the diminution in value of their properties from the government's flooding of their properties in response to future Harvey-like storms. *Id.* at 520–26; *see id.* at 530. The Court of Federal Claims awarded various Plaintiffs, including Ms. Popovici, compensation for structural repairs, replacement of personal property, displacement costs (including, for Mr. Sidhu, the loss of rental value of condo units), and loss of leasehold advantage. *Id.* at 526–31. To avoid duplicative recovery, the Court of Federal Claims reduced Plaintiffs' compensation by the amount of FEMA emergency relief that they received. *Id.* at 531–33.

These appeals, which cover those upstream plaintiffs designated as bellwethers for both liability and damages purposes, followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II. STANDARD OF REVIEW

"Whether a taking has occurred is a question of law based on factual underpinnings." *Stearns Co. v. United States*, 396 F.3d 1354, 1357 (Fed. Cir. 2005). We review de novo the legal conclusions of the Court of Federal Claims while reviewing its factual findings for clear error. *Id.* We review the denial of a motion to certify a class for abuse of discretion. *Consol. Edison Co. of N.Y., Inc. v. Richardson*, 233 F.3d 1376, 1379 (Fed. Cir. 2000).

## III. DISCUSSION

We address in turn: (1) the government's appeal of the liability decision; (2) Cross-Appellants' appeal of the denial of class certification; and (3) the respective appeals of the damages decision. We affirm as to the liability and class certification decisions. As related to the damages decision, we affirm as to leasehold advantage, damaged personal property, and offsetting of FEMA relief, but vacate as to

lost rent, displacement, and the valuation of Ms. Popovici's easement.

### A.

The government challenges the determination by the Court of Federal Claims that the operation of the Addicks and Barker Dams constituted a taking. *See* Appellant's Br. 20–55. The Fifth Amendment forbids the government from taking private property "for public use, without just compensation." U.S. Const. amend. V. Courts must evaluate two prongs in determining whether a government action constitutes a taking. "First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking. Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'" *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009). Courts also assess whether any defenses absolve the government of liability. *See TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1377–80 (Fed. Cir. 2013). The government argues that (1) Plaintiffs lacked cognizable property interests because any property interest was limited by the government's inherent police power, Appellant's Br. 45–55; (2) any property interests were not taken, Appellant's Br. 20–45; and (3) the doctrine of necessity absolves the government of any liability, Appellant's Br. 49–51. We reject each of the government's arguments.

### i.

We start by determining whether Plaintiffs held cognizable property interests in flowage easements. The Court of Federal Claims noted that "Plaintiffs are owners of private properties not subject to flowage easements" and that "[o]wnership of the properties by each plaintiff respectively and the lack of a previous flowage easement are not in dispute." *Liability Decision* at 248–49. Nevertheless, the government contends that Plaintiffs lacked a

compensable property interest because their land was held subject to the background understanding of government police power and the Flood Control Act's limit on government liability. Appellant's Br. 46–55. We disagree.

As the government notes, we rejected versions of those arguments in *Milton v. United States*, 36 F.4th 1154 (Fed. Cir. 2022). *See* Appellant's Br. 49, 55 (indicating that the government raises these arguments "to preserve the issue[s] for further review"). In *Milton*, we squarely rejected the government's argument that property rights were "held subject to the police power under federal law," explaining that the doctrine does not allow private property to be "subject to unbridled, uncompensated qualification under the police power." 36 F.4th at 1162. Rather, we explained that the doctrine of necessity serves as a defense precluding liability. *Id.* Similarly, we held that the Flood Control Act does not render the government "immune from suits alleging takings based on its flood control measures," because the Tucker Act's waiver of sovereign immunity for takings claims was not withdrawn in the Flood Control Act. *Id.* at 1160. While the latter holding was made in the context of jurisdiction, our recognition that takings liability is not barred by the Flood Control Act controls this case. *Cf. First Eng. Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304, 316 n.9 (1987) ("Though arising in various factual and jurisdictional settings, these cases make clear that it is the Constitution that dictates the remedy for interference with property rights amounting to a taking.").

To the extent that the government attempts to frame its position as arguing that the Flood Control Act should have led Plaintiffs to not expect compensation from the government for flowage easements, Appellant's Br. 51–55, its argument still fails. "Congress may not override the provision that just compensation must be made when private property is taken for public use." *Scranton v. Wheeler*, 179 U.S. 141, 153 (1900); *see also Tyler v. Hennepin Cnty.*,

598 U.S. 631, 645 (2023) ("[A state] may not extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking."). Accordingly, we reject the government's argument that Plaintiffs' property interests were limited by either the government's inherent police power or the Flood Control Act, and hold that Plaintiffs had a cognizable property interest in flowage easements on their land.

ii.

We now examine whether any taking occurred. "When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021). The government "effects a physical taking when it occupies property—say, by recurring flooding as a result of building a dam." *Id.* at 148; *see Ideker Farms, Inc. v. United States*, 71 F.4th 964, 978 (Fed. Cir. 2023). However, for cases involving so-called "temporary flooding," courts apply a "multi-factor test for determining if temporary government induced flooding is a taking rather than a mere trespass." *Ideker Farms*, 71 F.4th at 978. Accordingly, courts start by determining whether the flooding in a case would be (perhaps already was) recurring so as to be properly characterized as a permanent taking (even though the waters of each individual flood recede); if not, it is merely "temporary." *Id.* at 979. We conclude that the Court of Federal Claims did not err in finding that the flooding was permanently recurring[3] and, in the

---

[3] The Court of Federal Claims issued its liability decision prior to our issuance of *Ideker Farms*. Accordingly, it applied the full multi-factor test without the benefit of our holding that permanently recurring "flooding that foreseeably or intentionally results from government action is

alternative, that, even if the flooding were characterized as temporary, it would still constitute a taking.

1.

We hold that the flooding of Plaintiffs' properties gave rise to a permanent taking. The Supreme Court has distinguished between "intermittent but inevitably recurring overflows," which give rise to permanent takings, *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 32 (2012) (quoting *United States v. Cress*, 243 U.S. 316, 328 (1917)), and "takings temporary in duration," *id.* at 32, such as when a claimant was able to permanently "'reclaim[ ] most of his land which the government originally took by flooding.'" *Id.* at 33 (quoting *United States v. Dickinson*, 331 U.S. 745, 751 (1947)). Where "land is not constantly but only at intervals overflowed, the fee may be permitted to remain in the owner, subject to an easement in the United States to overflow it with water as often as necessarily may result from the operation of the" dam. *Cress*, 243 U.S. at 329. Our predecessor court specifically

---

a categorical physical taking." *Ideker Farms*, 71 F.4th at 981; *cf. Liability Decision* at 248 ("[T]he [multi-factor test] considerations remain relevant to the inquiry here, that is, whether the government's actions with regard to Addicks and Barker constitute a compensable taking, albeit a permanent one."). However, the Court of Federal Claims made numerous factual findings en route to its liability determination that adequately enable us to review its decision under the proper legal framework. *See Liability Decision* at 250 ("The government, through its construction, maintenance, and operation of the Addicks and Barker Dams in the past, present, and future, has taken a permanent flowage easement on plaintiffs' properties."); *id.* at 251 (citing the frequency of storms and testimony to find that "[t]he future recurrence of a similarly large storm, producing comparable rainfall, remains likely to occur again").

held that "only one actual flooding is enough when the property is upstream of the dam and below the contour line to which the dam is designed to impound water." *Stockton v. United States*, 214 Ct. Cl. 506, 518–19 (1977). These cases confirm that whether flooding is inevitably recurring turns not on mere frequency, but on whether there is a "government action that will foreseeably produce intermittent invasions by flooding without identifiable end into the future." *Ideker Farms*, 71 F.4th at 979. When that is true, "the government takes a permanent right of access, akin to an easement in gross, even if used only intermittently," and has effected a per se taking. *Id.* at 980.

The Court of Federal Claims made factual findings that flooding of Plaintiffs' properties was foreseeable and would inevitably reccur without identifiable end. The Court of Federal Claims found that "the Corps was aware or should have been aware since the initial construction of the dams and at every point onward, that the flood pools in the Addicks and Barker Reservoirs would at some point (and thereafter) exceed the government-owned land, inundating private properties." *Liability Decision* at 255. It found that the Corps understood that "storms of exceptionally large size were possible in the Houston metropolitan area," that "pools of this size and the attendant flooding of private property were, at a minimum, objectively foreseeable," and that Plaintiffs' properties were "by government design, within the dams' flood-pool reservoirs." *Id.* at 254–56. Moreover, it found that "the sheer frequency of significant storms . . . suggests that this was more than an isolated event, and that it is likely to recur." *Id.* at 251.

These findings are not clearly erroneous. There was ample record evidence that the Houston area was prone to large storms and that the Corps designed and operated the Addicks and Barker Dams knowing that pools exceeding the government-owned land would form. *See, e.g.*, J.A. 8786–87 ("Harris County has been subjected to at least 14 major storm events in the last 80 years . . . . [H]ad

some of these events been centered over Addicks and Barker Reservoirs or the Upper Buffalo Bayou Watershed, the combined rainfall and runoff could have resulted in flood pools exceeding the limits of government owned land."); J.A. 8398 ¶ 13 ("[O]nly chance has prevented the occurrence of a storm over the basin much larger than the 1935 storm."); J.A. 8863–64 ¶ 4.2 (describing the inevitability that the government will have "to flood the area within the reservoir with the accompanying damages in order to protect downstream improvements in the event of a severe future storm"). While the exact frequency of storms that would flood private property is unknowable, the Court of Federal Claims did not clearly err in holding that the flooding at issue here was objectively foreseeable and would inevitably recur. Therefore, we conclude that the "permanent intermittent flooding" of Plaintiffs' properties was "a physical taking subject to a *per se* rule," *Ideker Farms*, 71 F.4th at 980, and hold that the government took permanent flowage easements in Plaintiffs' properties.

2.

Even if the flooding of Plaintiffs' properties were temporary, we would still hold that the government took Plaintiffs' properties. For cases involving "temporary flooding," courts apply a "multi-factor test for determining if temporary government induced flooding is a taking rather than a mere trespass." *Ideker Farms*, 71 F.4th at 978. These factors include "time," "the degree to which the invasion is intended or is the foreseeable result of authorized government action," "the character of the land at issue," "the owner's reasonable investment-backed expectations regarding the land's use," and the "[s]everity of the interference." *Ark. Game*, 568 U.S. at 38–39 (inner quotation marks and citations omitted); *see also Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355–56 (Fed. Cir. 2003). On appeal, the government does not directly contend that the Court of Federal Claims erred in finding that the character of the land, *Liability Decision* at 248 n.18, and

ABLAN v. US                                                                    15

severity of the interference, *id.* at 250–53, weigh in favor of the Plaintiffs. *See generally* Appellant's Br. 20–35. On appeal, the government challenges the Court of Federal Claims' analysis of the time, Appellant's Br. 22–27, intent or foreseeability, Appellant's Br. 27–38, and reasonable investment-backed expectations factors. Appellant's Br. 39–45. With respect to the time and duration of the taking, the government argues that Hurricane Harvey was an "isolated trespass[ ]" and that the easement would be used "during only the most extreme natural disasters." Appellant's Br. 24. However, the Court of Federal Claims reasonably found that the government "reserves the right to repeat the impoundment" and that "the likelihood of recurrent flooding is high." *Liability Decision* at 251 & n.20. As the Court of Federal Claims found, the government has obtained a "permanent right to inundate the property with impounded flood waters." *Liability Decision* at 250. We see no clear error in the Court of Federal Claims' determination that this factor weighs in favor of Plaintiffs.

The Court of Federal Claims similarly did not clearly err in finding that the government foresaw the invasion of Plaintiffs' properties and intentionally took flowage easements on them. *Liability Decision* at 254–60. The government argues that "urban development" of the land was unanticipated. Appellant's Br. 33. However, the inquiry is whether "*the invasion* is intended or is the foreseeable result of authorized government action," *Ark. Game*, 568 U.S. at 39 (emphasis added), not whether the extent of the damage from the invasion was foreseeable.[4] *See Sanguinetti*

---

[4]    Indeed, the government could have "taken appropriate proceedings, to condemn as early as it chose, both land and flowage easements." *Dickinson*, 331 U.S. at 747. By choosing not to do so and thus taking the calculated risk that severe storms would not occur, it "left the taking to physical events." *Id.* at 748.

*v. United States*, 264 U.S. 146, 149–50 (1924) (focusing on whether "overflow was the direct or necessary result of the structure" or "within the contemplation of or reasonably to be anticipated by the government").  Thus, for the reasons discussed in Section III.A.ii.1, *supra*, intent or foreseeability weighs in favor of Plaintiffs.

Lastly, we see no clear error in the Court of Federal Claims' finding that Plaintiffs' reasonable investment-backed expectations weigh in favor of finding a taking.[5] *Liability Decision* at 263.  A takings claim is "not barred by the mere fact that title was acquired after" the government has acted.  *Palazzolo v. Rhode Island*, 533 U.S. 606, 630 (2001).  While the government argues that Plaintiffs should have known that their land was susceptible to flooding, Appellant's Br. 39–45, the Court of Federal Claims justifiably relied on: (1) the undisputed fact "that plaintiffs did not know their properties were located within the reservoirs and subject to attendant government-induced flooding," *Liability Decision* at 262; (2) that "average homeowner[s] do[ ] not generally know" how to "read and understand" government maps that indicated the Plaintiffs' properties were within the dams' reservoirs, *id.*;

---

[5]    We assume, without deciding, that the Supreme Court's decision in *Arkansas Game* incorporated the "reasonable investment-backed expectations" test from the regulatory takings context into the temporary flooding context.  568 U.S. at 39 (describing reasonable-investment-backed expectations as a factor, citing regulatory takings cases); *cf. Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982) (explaining that "physical *invasion* cases are special" and that "a permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors" like "the extent to which [a regulation] interferes with investment-backed expectations").

(3) that "it would take an uncommonly attentive eye to notice" the "miniscule details" in "subdivision plats, which indicate that land was subject to controlled inundation," *id.*; (4) that "there is no evidence that [public] meetings [conducted by the Corps and local governments] were heavily attended or particularly well publicized," *id.* at 263; and (5) that a regular flow of people moving in and out of the community meant that many new residents would not know of the risk of flooding, *id.* The Court of Federal Claims' weighing of this evidence and finding that reasonable investment-backed expectations weigh in favor of Plaintiffs were not clearly erroneous.

Accordingly, even if the flooding of Plaintiffs' properties were temporary, we would hold that the government took flowage easements on Plaintiffs' properties because every factor of the *Arkansas Game* test favors Plaintiffs.

### iii.

The government contends that any taking is excused by a necessity defense. *See* Appellant's Br. 45–51. We disagree. This is not a case where the government prevented a landowner from activities "akin to public nuisances." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1022 (1992). Nor is it one where the government's actions were in response to an unforeseeable exigency, such as where urgent action was taken "to prevent the spreading of a fire." *See id.* at 1029 n.16 (quoting *Bowditch v. City of Boston*, 101 U.S. 16, 18–19 (1879)). And the government did not build and operate the Addicks and Barker Dams for the benefit of Plaintiffs. *Cf. Nat'l Bd. of YMCA v. United States*, 395 U.S. 85, 90–93 (1969) (holding that there was no compensation for takings liability when there was a temporary and unplanned occupation of petitioners' buildings by troops who "were acting primarily in defense of petitioners' buildings," rather than the "general defense" of the zone). Instead, the government, as it does in every

flooding case,[6] allocated the location of water between private citizens. In doing so, it aided some property owners (downstream residents) and harmed others (upstream residents). "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar [g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Accordingly, we reject the government's necessity defense.

Having held that Plaintiffs had a property interest, that a taking occurred, and that no defense applies, we affirm the *Liability Decision*.

## B.

Cross-Appellants contend that the Court of Federal Claims abused its discretion by denying class certification. Cross-Appellants' Br. 63–68. Cross-Appellants contend that, as a factual matter, the Court of Federal Claims clearly erred by concluding that there was "no basis . . . to credit plaintiffs' argument that the court instructed or asked them to delay their class certification motion." Cross-Appellants' Br. 65–66 (quoting *Class Certification Decision* at 200). As a legal matter, Cross-Appellants also contend that the Court of Federal Claims erred by holding that "a trial on the merits of liability is a line after which moving for class certification is presumptively inappropriate." *Class Certification Decision* at 196; *see* Cross-Appellants' Br. 66–68. We consider and reject both arguments.

---

6    Indeed, at least one circuit court has distinguished "flooding case[s]" from those that involve "necessity during an active emergency," such as a "hostage situation" or a "potential shootout." *Baker v. City of McKinney*, 84 F.4th 378, 384–85 (5th Cir. 2023).

Judge Lettow did not err in finding that the Court of Federal Claims did not instruct Plaintiffs to delay their class certification motion. Cross-Appellants' factual argument relies heavily on statements by then-Chief Judge Braden that she would set a new scheduling order, J.A. 2192–93 at 193:6–194:22, and that "the economic impact of the Army Corps of Engineers' actions in these cases requires discovery and full consideration of the legal theory that may require a liability determination, before class action certification is considered." J.A. 2308. However, the cases were reassigned to Judge Lettow, who agreed that it "ma[de] sense" to handle class certification "during the merits briefing." J.A. 2207 at 11:5–11; *see* J.A. 2205–08 at 9:12–12:6. Cross-Appellants contend that by saying he "would strongly prefer that we focus on jurisdiction first, even though a lot of that would carry over to liability" and "[t]hat might affect [counsel's] thinking on class certification," J.A. 2206 at 10:17–20, Judge Lettow, like Judge Braden, permitted Plaintiffs to wait to file their class certification motion until after jurisdiction and liability were concurrently resolved. Cross-Appellants' Br. 65. However, Judge Lettow's statement is at best ambiguous as to whether he was suggesting that class certification should be addressed during briefing of the merits or after jurisdiction was resolved.[7] A trial court's "interpretation of its order is entitled to deference unless the interpretation is unreasonable or is otherwise an abuse of discretion." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1358 (Fed. Cir. 2008). Judge Lettow's statements were not so clear that

---

[7] Notably, Judge Lettow appears to have expected class certification to have been raised earlier, *see* J.A. 2205–06 at 9:24–10:2 (asking why there was no motion for class certification yet), and Plaintiffs did not indicate to Judge Lettow that they were relying on any statements from then-Chief Judge Braden. *See generally* J.A. 2203–15.

Plaintiffs were entitled to rely upon them to delay class certification.  Accordingly, we hold that Judge Lettow did not clearly err in finding that Plaintiffs were not instructed to delay their class certification motion until after a liability trial.

Turning to Cross-Appellants' legal challenge, we decline to adopt a rule that generally (if not ever) permits "foisting trial-before-certification on an unwilling" defendant in an optional class suit.  *In re Citizens Bank, N.A.*, 15 F.4th 607, 619 (3d Cir. 2021).  In doing so, we join all other Courts of Appeals that have considered this issue in relation to Federal Rule of Civil Procedure 23(b)(3).[8]  *See id.* at 618–19, 618 n.11 (collecting cases).  Cross-Appellants contend that the opt-in nature of RCFC 23 class actions makes them more like mandatory Fed. R. Civ. P. 23(b)(2) injunctive class actions than optional Fed. R. Civ. P. 23(b)(3) damages class actions.  Cross-Appellants' Reply Br. 19–20; *see* 3 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 7.11 (6th ed. 2025) (noting that Fed. R. Civ. P. 23(b)(2) actions pose less concern for post-trial class certification than Fed. R. Civ. P. 23(b)(3) actions).  We disagree with Cross-Appellants and conclude that the logic behind precluding post-trial certification of Fed. R. Civ. P. 23(b)(3) class actions applies equally to RCFC 23.  For classes certified under both these rules, unlike for Fed. R. Civ. P. 23(b)(2) classes, a plaintiff would have the option to join or leave the class after seeing the

---

[8]    There is a circuit split on whether a defendant's consent can provide an exception to this rule.  *See In re Citizens Bank, N.A.*, 15 F.4th 607, 618–19 (3d Cir. 2021) (noting that seven Courts of Appeals have held that Rule 23 requires class certification prior to a trial on the merits, while four Courts of Appeals have allowed limited exceptions in cases involving defendant consent).  This issue is not before us, and accordingly we do not resolve it.

liability verdict.  *See* RCFC 23(c)(2)(v) ("[T]he court will include in the class any member who requests inclusion."). Allowing plaintiffs to know the liability ruling before deciding whether to join the class often would be manifestly unjust.  *See Am. Pipe & Const. Co v. Utah*, 414 U.S. 538, 547 (1974) (describing it as a "recurrent source of abuse" in a former version of Fed. R. Civ. P. 23 that "members of the claimed class could in some situations await developments in the trial or even final judgment on the merits in order to determine whether participation would be favorable to their interests").  Therefore, we join our sister circuits in at least presumptively refusing to permit opposed post-trial class certification for optional classes, and we affirm the denial of class certification here.[9]

## C.

The government and Cross-Appellants each appeal portions of the *Damages Decision*.  The government challenges (1) the award of compensation for personal property and structures to all Plaintiffs, Appellant's Br. 61–62; *see Damages Decision* at 525–30; (2) the award of compensation to Mr. Holland for the loss of his "leasehold advantage," Appellant's Br. 56–57; *see Damages Decision* at 526; (3) the award of lost income, utility payments, and lost rent to Mr. Sidhu, a landlord whose units flooded, Appellant's Br. 57–59; *see Damages Decision* at 531; and (4) the award of displacement or dislocation costs to several Plaintiffs who rented alternative housing while their properties were inaccessible or unrepaired, Appellant's Br. 59–61, *see Damages Decision* at 530–31.  Cross-Appellants challenge (1) the award of $0 for the flowage easement on Ms. Popovici's property, Cross-Appellant's Br. 57–58; *see Damages Decision* at 526, 529–30; and (2) the offsetting of

---

[9]    We do not decide whether other plaintiffs with similar claims, whose cases have not proceeded through trial, may move for class certification.

FEMA emergency relief aid payments from several Plaintiffs' compensation awards, Cross-Appellants' Br. 58–62; *see Damages Decision* at 531–33. We reject the government's arguments regarding personal property and leasehold advantage and Cross-Appellants' argument regarding FEMA offsets. We vacate with respect to Mr. Sidhu's lost income, the displacement costs, and the valuation of the flowage easement on Ms. Popovici's property.

i.

We start by addressing the government's challenges to the *Damages Decision*.

First, the Court of Federal Claims properly awarded compensation for structures and personal property damaged during Hurricane Harvey. Contrary to the government's assertions, Appellant's Br. 61, "Plaintiffs do not claim compensation consequential to the taking of an easement—rather, they seek compensation for the government's appropriation of two distinct property interests" as a result of the flooding. *Ideker Farms*, 71 F.4th at 988. In *Ideker Farms*, we awarded compensation to farmers whose land was flooded, not just for the value of a "permanent flowage easement," but also for the "crops and other personal property destroyed by flooding." *Id.* at 987; *see generally Ark. Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1378 (Fed. Cir. 2013) (on remand from the Supreme Court, affirming the Court of Federal Claims' decision awarding damages for trees destroyed by temporary flooding). We have explained that "the flowage easement awarded by the trial court compensates Plaintiffs for the taking caused by *future* flooding," and that past damages can be compensable if derived from a separate property interest. *Ideker Farms*, 71 F.4th at 986–87. This rule reflects the difference between condemnations and inverse condemnations: "when the government chooses not to condemn land but to bring about a taking by a continuing process of physical events," the government bears the risk.

*Dickinson*, 331 U.S. at 749. The Court of Federal Claims applied our precedent by awarding damages both for the value of the flowage easement and the value of destroyed structures and personal property.

Second, the Court of Federal Claims properly awarded Mr. Holland compensation for the taking of his leasehold advantage. "It has long been established that the holder of an unexpired leasehold interest in land is entitled, under the Fifth Amendment, to just compensation for the value of that interest when it is taken upon condemnation by the United States." *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 303 (1976) (footnote omitted). "The measure of damages is the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew . . . , less the agreed rent which the tenant would pay for such use and occupancy." *Id.* at 304 (alteration in original) (quoting *United States v. Petty Motor Co.*, 327 U.S. 372, 381 (1946)). Mr. Holland had an unexpired below-market lease with six months remaining at the time that his landlord indicated he would not restore the property and terminated his lease. *Damages Decision* at 526; *see id.* at 510 & n.8. Accordingly, the Court of Federal Claims adhered to *Alamo Land* by awarding Mr. Holland the difference between the monthly rent he was paying before his lease was terminated and the fair rental value multiplied by six. *See id.* at 526; *id.* at 510 & n.8. Thus, the Court of Federal Claims did not err by awarding Mr. Holland compensation.

Third, the Court of Federal Claims erred by awarding Mr. Sidhu compensation for lost income, utility payments, and rent. While Plaintiffs may be compensated for "separate and independent loss of compensable property" such as "personal property," "lost profits from operating a business are not compensable." *Ideker Farms*, 71 F.4th at 987–89; *see United States v. Gen. Motors Corp.*, 323 U.S. 373, 380 (1945) ("[D]amage to those rights of ownership does not include losses to his business or other consequential

damage."). In defending the trial court's award of lost rent, lost income, and utility payments to Mr. Sidhu, Cross-Appellants principally rely on *Ideker Farms*. *See* Cross-Appellants' Br. 52–54. Cross-Appellants overread our precedent: In *Ideker Farms* we held that the plaintiffs could receive compensation for destroyed personal property and crops to the extent "it was a separate and independent loss" not tied to the "value generated from the owner's use of property." *Ideker Farms*, 71 F.4th at 987. Thus, the plaintiffs in *Ideker Farms* could receive compensation for their land based on a flowage easement and separately for their destroyed crops but could not receive compensation for "revenues [p]laintiffs expected from unplanted seeds that were *not* destroyed by the flooding." *Id.* at 987–88. Likewise, Mr. Sidhu received compensation for his real property interest in the form of compensation for a flowage easement, *Damages Decision* at 525–26, but should not also receive the lost profits tied to his business use of that real property. *Gen. Motors*, 323 U.S. at 379. Accordingly, we hold that the Court of Federal Claims erred by awarding Mr. Sidhu compensation for lost rent and for utility payments.

Fourth, the Court of Federal Claims erred by awarding some Plaintiffs costs for the amounts they spent renting alternative housing while their properties were inaccessible. Relocation costs may sometimes be considered, "not as independent items of damage but to aid in the determination of what would be the usual—the market—price . . . for [a] temporary occupancy." *Gen. Motors*, 323 U.S. at 383 (considering the cost to remove goods from a warehouse as part of the just compensation inquiry). Here, however, the government, by way of the permanent flowage easement, received the right to temporarily occupy Plaintiffs' property with water. Thus, Plaintiffs have already received "the market rental value of such a [property interest] by the long-term tenant to the temporary occupier," and no further compensation for the temporary occupation is proper.

*Id.*; *see id.* at 382 (When there is a permanent taking of a property, one "must stand whatever indirect or remote injuries are properly comprehended within the meaning of 'consequential damage.'"). And, as noted above, there is no separate property interest like in *Ideker Farms* for which a court can properly award damages. Thus, the Court of Federal Claims erred by awarding Plaintiffs costs for their temporary displacement.

ii.

We turn now to Cross-Appellants' challenges to the *Damages Decision*.

The Court of Federal Claims clearly erred by not awarding compensation to Ms. Popovici for the flowage easement on her property. Like other Plaintiffs, Ms. Popovici sought compensation for past damage ($1,401.49 for the costs to repair her garage), *Damages Decision* at 530, and prospective damages as compensation because of a flowage easement (valued at over $100,000 by Plaintiffs' experts and at $5,000 by the government's expert), *Damages Decision* at 512, 515. The Court of Federal Claims awarded her $1,401.49 in total compensation. *Damages Decision* at 534. In so doing, it appears that the Court of Federal Claims, without explanation, valued the flowage easement on Ms. Popovici's property at $0. Indeed, the Court of Federal Claims found that, while there was no structural flooding, the majority of Ms. Popovici's property was subject to the flowage easement, *Damages Decision* at 510, and the water remained for between four and six days while preventing ingress or egress. *Liability Decision* at 243. In light of those unchallenged factual findings, we hold that it was clear error to value the government's permanent right to flood Ms. Popovici's property at $0. *Cf. Cedar Point*, 594 U.S. at 148 ("The government must pay for what it takes."). We vacate this portion of the *Damages Decision* for the Court of Federal Claims and remand to re-evaluate Ms. Popovici's damages award.

We reject Cross-Appellants' argument that the Court of Federal Claims erred by offsetting their compensation awards by the amount already received from FEMA because Cross-Appellants did not receive any "special benefits" that inured "specifically to the landowner who suffered the partial taking" and that were "associated with the ownership of the remaining land." Cross-Appellants' Br. 59 (quoting *Hendler v. United States*, 175 F.3d 1374, 1380 (Fed. Cir. 1999)). Cross-Appellants rely on a limitation to the relative benefits doctrine which states that when the government's taking helps a claimant, that value can be offset only if it is not to the "community at large." *Hendler*, 175 F.3d at 1380. However, this test is only a narrow application of the broader principle that a plaintiff whose property was taken "must be made whole but is not entitled to more." *Olson v. United States*, 292 U.S. 246, 255 (1934). Thus, the Court of Federal Claims did not err in considering whether double recovery would ensue if FEMA awards were not offset.

The Court of Federal Claims did not clearly err in finding that double recovery would ensue if FEMA awards for damaged personal property were not offset. Cross-Appellants primarily take issue with the decision by the government to "present evidence exclusively about the categories of relief FEMA paid, rather than any specific items for which FEMA reimbursed plaintiffs." Cross-Appellants' Br. 61. The Court of Federal Claims made a factual finding that these award categories were the "very same property losses and damages" that Cross-Appellants claimed as personal property losses. *Damages Decision* at 532. That finding was not clearly erroneous and is adequately supported by expert testimony and by Cross-Appellants' inventories listing personal property similar to that paid for by FEMA. *See, e.g.*, J.A. 7694–96 at 2725:4–2730:13 (expert testimony mapping Plaintiffs' losses onto the FEMA awards); J.A. 11383–413 (personal property depreciation estimates). The Court of Federal Claims did not clearly err in

holding that the government carried its burden to demonstrate that FEMA payments already compensated Plaintiffs' personal property losses and that prevention of double recovery required offsetting the FEMA awards.

## IV. CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm the *Liability Decision* and the *Class Certification Decision*, and we affirm-in-part and vacate-in-part the *Damages Decision*. We remand to the Court of Federal Claims for reconsideration of the amount of compensation due to Ms. Popovici and re-evaluation of damages consistent with this opinion.

**AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED**

### COSTS

No costs.